UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                      Plaintiff,

      v.

COREY L. GREEN,

                      Defendant.
_____

REPORT & RECOMMENDATION

19-CR-6164CJS

## PRELIMINARY STATEMENT

By Order of the Hon. Charles J. Siragusa, United States District Judge, dated September 24, 2019, all pretrial matters in the above-captioned case have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B).  (Docket # 21).

On September 24, 2019, a three-count indictment was returned against defendant Corey L. Green ("Green") charging him with possession of a firearm and ammunition as a convicted felon, in violation of 18 U.S.C. §§ 922(a)(1) and 924(a)(2), possession of marijuana, in violation of 21 U.S.C. § 844(a), and possession of cocaine, in violation of 21 U.S.C. § 844(a). (Docket # 19).  Currently pending before the Court is Green's motion to suppress evidence. (Docket # 28).[1]

On January 27, 2020, this Court held an evidentiary hearing on the suppression motion, at which the government called Rochester Police Department ("RPD") Officer Brandon

---

[1] Green's omnibus motions also sought, *inter alia*, *Brady* material, discovery and inspection, disclosure of Rule 404, 608 and 609 evidence, *Jencks* material, preservation of rough notes, and leave to file additional motions. (Docket # 28).  Each of these motions was decided by the undersigned or resolved by the parties in open court on December 20, 2019.  (Docket # 32).

Contreras ("Contreras") to testify. (Docket ## 34, 39). The Court continued the evidentiary hearing on February 18, 2020, at which time the defense called RPD Officer Adam Bradstreet ("Bradstreet"). (Docket ## 38, 40). Footage from body cameras worn by Contreras and Bradstreet was also entered into evidence. (Government's Exhibits ("G. Exs.") 6 and 8). For the reasons discussed below, I recommend that the district court deny Green's motion to suppress evidence.

## FACTUAL BACKGROUND

The hearing testimony and body camera footage are summarized below. (Docket ## 39, 40; G. Exs. 6 and 8).

### I.  Testimony of Officer Brandon Contreras

Contreras testified that he has worked as a police officer for RPD for approximately four years. (Tr. A 5)[2]. On February 16, 2019, at approximately 10:20 p.m., he was on patrol in a marked police vehicle in the area of the intersection of Carter Street and Roycroft Drive in the city of Rochester. (Tr. A 7-8). He was accompanied on patrol by two other officers, Bradstreet and Officer Castrichini ("Castrichini"), who drove their own patrol cars approximately ten feet behind Contreras. (Tr. A 27, 31-32).

According to Contreras, as he was traveling northbound on Carter Street and approaching the intersection with Roycroft Drive, he observed a black pickup truck on the southside of Roycroft Drive in front of the corner store located at that intersection. (Tr. A 8-9, 19-21, 28-29; G. Ex. 1). Contreras observed a man exit the driver's seat of the truck and enter

---

[2] The transcript of the January 27, 2020 hearing shall be referred to as "Tr. A___," and the transcript of the February 18, 2020 hearing shall be referred to as "Tr. B ___." (Docket ## 39, 40).

the store. (Tr. A 9). As he approached the truck, he could tell that it was still running because he observed exhaust fumes and heard music coming from the vehicle. (Tr. A 9, 31). Contreras parked his patrol vehicle in front of the truck and got out in order to investigate whether the truck had been left running while unattended, which would have been a violation of the New York Vehicle and Traffic Law. (Tr. A 9-10, 27-28, 32). Castrichini and Bradstreet also parked and exited their vehicles at about the same time as Contreras did; one parked in the street to the right of the truck, and the other directly behind the truck. (Tr. A 30, 34, 40).

As Contreras approached the truck, he noted that the driver's window was halfway down and the vehicle was unoccupied. (Tr. A 10, 35; G. Exs. 2-3). He shined his flashlight into the vehicle and inspected the registration sticker; as he was doing so, Green walked out of the store, approached the truck, and informed Contreras that the vehicle belonged to him. (Tr. A 10-11, 35-40). According to Contreras, Green was large – approximately six feet four inches in height and approximately 275 pounds in weight. (Tr. A 29). When he observed Green exiting the store, Contreras activated his body camera. (Tr. A 40). Contreras testified that he had "a brief conversation [with Green] about leaving the car running with the window down and no one inside." (Tr. A 10-11). Contreras asked Green for his identification, and Green opened the driver's side door to retrieve it. (Tr. A 12, 40).

Contreras testified that he shined his flashlight into the vehicle as Green opened the door and observed the rear slide and handle of a gun underneath the driver's seat. (Tr. A 12, 66; G. Ex. 5). According to Contreras, he had received training relating to traffic stops and was aware that weapons are often located in "grabbable" areas within vehicles, such as under seats and in cup holders. (Tr. A 6-7). Contreras stated that he was standing within inches of the vehicle when he observed the gun and that his view of the handgun was unobstructed even

3

though Green was standing in the doorway between Contreras and the vehicle. (Tr. A 12-13, 41-42; G. Ex. 5). When he saw the gun, Contreras immediately detained Green by turning him around and placing him in the care of the other officers at the scene. (Tr. A 13, 42).

According to Contreras, after Green had been detained, he began an inventory search of the truck in accordance with RPD general orders. (Tr. A 13-16). Contreras testified that RPD has a general order relating to the towing of vehicles that outlines specific steps to be followed prior to towing a vehicle. (Tr. A 14-15; G. Ex. 7). The general order requires that vehicles be towed incident to controlled substance felony arrests and permits that vehicles be towed incident to other types of arrests if the vehicle is "illegally parked, blocking, hazardous, for safekeeping, or when required by law." (G. Ex. 7 at 2-3).

Pursuant to the general order, an officer must consider various factors in determining whether to tow the vehicle for safekeeping, including the crime rate in the area, the proximity of the vehicle to the "operator/owner's" residence, the presence of valuables in the vehicle, and the ready availability of another person to legally and safely operate the car with the owner's authorization. (G. Ex. 7 at 3). When an officer decides to tow a vehicle, the officer must determine whether the vehicle has been stolen and must complete a tow report and conduct an inventory search of the vehicle in order to protect the owner's property, ensure against claims of lost, damaged or stolen property, and protect the officer and the public from any dangerous instrumentalities inside the vehicle. (Tr. A 15-17; G. Ex. 7 at 4).

Contreras acknowledged that the provision of the general order mandating towing incident to controlled substance felony arrests did not apply to the incident with Green because at the time the search began Green was not under arrest for a controlled substance felony. (Tr. A 58). He testified that it was his usual practice to search and tow any vehicle in which a handgun

4

was found to ensure that no other guns or other dangerous weapons were inside the vehicle. (Tr. A 55-58).

Contreras also testified that towing Green's truck was appropriate because Green was being charged with a felony offense and "there was no one else that could take the vehicle." (Tr. A 13). Contreras testified that he was confident that before undertaking the inventory search he had been informed that either Bradstreet or Castrichini had attempted unsuccessfully to contact the registered owner of the vehicle. (Tr. A 50-51, 53-54). Contreras stated that he could not recall whether he heard any discussion about attempts to contact the owner on his body camera footage, but he acknowledged that such discussion would have been captured. (Tr. A 53-54, 59-60).

According to Contreras, the search of the truck started within minutes of Green's arrest while Contreras's body camera was still activated. (Tr. A 50, 53, 65). At the time of the search, the position of Green's truck obstructed two or three of the store's parking spots. (Tr. A 17). Contreras observed that the registration sticker was improperly displayed (vertically, instead of horizontally), and Green was issued traffic tickets for leaving a running vehicle unattended and for the improper display of the registration sticker. (Tr. A 19, 23-24, 35-36; G. Exs. 3-4). During the search, Contreras looked in the armrest, cup holders, and underneath the seats. (Tr. A 18). In addition to the handgun, he discovered and seized quantities of suspected marijuana and cocaine from inside the armrest and two cellular phones from one of the cup holders. (Tr. A 18, 61).

Contreras also testified that RPD has general orders pertaining to officer-worn body cameras. (Tr. A 37-38). The orders require officers to activate and record activities and contact with persons in the course of performing police duties so long it is safe and practical to

5

do so. (Tr. A 38). The orders provide that officers should activate their cameras after being dispatched to an area and prior to exiting their police vehicle. (Tr. A 38-39). When the camera is activated, it automatically saves video footage from the preceding thirty seconds. (Tr. A 27, 39). Audio begins to be captured from the moment the camera is activated. (*Id.*).

Contreras acknowledged that he did not activate his camera until Green came out of the store and approached him. (Tr. A 25, 39-40). He testified that he did not feel that it was safe to do so before then because of the incidence of violence in the area. (Tr. A 47-48). According to Contreras, when he did activate the camera, he was protected from the street by the position of the truck. (Tr. A 49). He acknowledged that he could have activated the camera before he opened his vehicle's door. (Tr. A 48-49).

Contreras testified that while at the scene he telephoned the city camera room to inquire whether the camera at the intersection of Roycroft Drive and Carter Street had captured any portion of the arrest. (Tr. A 43-44). According to Contreras, he indicated that the incident involved a black truck and he provided the approximate time of his arrival at the scene. (Tr. A 45). Contreras testified that he was informed that the camera was facing the opposite direction and captured no footage of the incident. (Tr. A 43-44). Contreras himself did not review the camera footage, nor did he ask that it be preserved. (Tr. A 44-46). He did note in his report that the camera did not capture the incident. (Tr. A 45).

## II.   **Testimony of Officer Adam Bradstreet**

Bradstreet testified he has been employed as an RPD officer since September 2016 and was on patrol in a marked vehicle with Contreras and Castrichini on the evening of February 16, 2019. (Tr. B 7-8). According to Bradstreet, as the officers were traveling

6

northbound on Carter Street, they turned left onto Roycroft Drive, and Contreras parked his vehicle in front of a truck. (Tr. B 10-12). Bradstreet pulled his vehicle behind the truck, and Castrichini also stopped and parked. (Tr. B 12-13).

Bradstreet exited his vehicle and approached the front passenger side of the truck; as he did so, he did not know whether the vehicle was unattended. (Tr. B 10-11, 15). According to Bradstreet, at some point after he exited his vehicle, he heard Contreras alert RPD dispatch that the officers were investigating a "suspicious," referring to the act of exiting a vehicle to investigate possible unlawful conduct. (Tr. B 10-12).

Before assisting with Green's detention, Bradstreet had not observed any gun in the truck, nor did he recall having heard anyone mention a gun. (Tr. B 14-15). He testified that he heard Contreras instruct the other officers to handcuff Green. (Tr. B 14, 16). Bradstreet observed the gun in the truck after Green was handcuffed but before the search of the vehicle had begun. (Tr. B 24).

Green was searched and escorted to Bradstreet's patrol car. (Tr. B 16-17). While seated in the back of the patrol car, Green asked Bradstreet whether someone could come and retrieve the truck. (Tr. B 20). Bradstreet responded in the negative and told Green that the truck would be towed. (Tr. B 20-21). Bradstreet testified that he did not attempt to identify the registered owner of the vehicle or to contact anyone to retrieve the vehicle. (Tr. B 20-21, 23). Bradstreet did not recall that any other officer informed him that they had attempted to contact someone to take the truck. (Tr. B 21).

Bradstreet testified that he activated his body camera prior to exiting his vehicle and acknowledged that he had no safety concerns about doing so inside his vehicle. (Tr. B 13). Bradstreet testified that his camera was on during all his interactions with Green, but was off

7

during those times in which he was not directly interacting with Green, such as periods when officers were conversing outside of Green's presence. (Tr. B 13-14, 17-20, 25-26, 28-32).

### III.     Contreras's Body Camera Footage

The footage from Contreras's body camera begins at approximately 10:18 p.m. (G. Ex. 6). At that time, Green can be seen approaching the driver's side door of a black truck. (*Id.* at 22:18:46 – 22:18:54). As Green attempts to open the door, Contreras appears to approach him and an inaudible discussion between the two occurs. (*Id.* at 22:18:55 – 22:18:57). Almost immediately thereafter, Green opens the driver's door and leans into the truck. (*Id.* at 22:18:57 – 22:19:00). Initially, the driver's door is positioned between the camera and the interior of the truck, but as Green leans into the truck, the camera shifts to the right so that only Green is between the camera and the interior of the vehicle. (*Id.* at 22:19:00 – 22:19:03). The interior is briefly visible. (*Id.* at 22:19:01). The footage momentarily goes black, and then appears to depict Green's hands behind his back and another officer approaching from the rear of the vehicle. (*Id.* at 22:19:03 – 22:19:07). Green is escorted from the doorway of the vehicle and appears to be handcuffed. (*Id.* at 22:19:07 – 22:19:24). Audio begins approximately thirty seconds into the footage and initially consists of music coming from the interior of the truck. (*Id.*).

During the next few moments, the camera spans back and forth between the open door of the truck and Green, who is being searched by Bradstreet and Castrichini. (*Id.*). Contreras contacts dispatch to advise that the officers have gotten out of their vehicles at the intersection of Carter and Roycroft and have found a handgun. (*Id.* at 22:19:25 – 22:19:34). Contreras partially enters the vehicle and turns the engine off, silencing the music. (*Id.* at

8

22:19:43). He continues communicating with dispatch to relay the license plate number of the truck. (*Id.* at 22:19:51 – 22:19:57). Contreras looks into the truck and instructs the other officers to search Green and place him in one of the patrol vehicles. (*Id.* at 22:20:03 – 22:20:30). Two other officers approach the truck, and each asks where the gun is located. (*Id.* at 22:20:30, 22:20:47). Contreras replies that it is "right under the seat." (*Id.* at 22:20:32, 22:20:49).

> Contreras then tells the unidentified officers:
>
> He left it here running. He opens the door. And I literally, I'm standing right there, and I'm talking to him, and I'm like, "Where you guys coming from? Where you going to?" And I just look and I shine the light and I see the butt of the gun. So I'm like, "Yo, yo, yo."

(*Id.* at 22:20:54 – 22:21:05). Soon after this conversation, Contreras begins searching the vehicle, and the footage ends momentarily thereafter. (*Id.* at 22:21:20 – 22:21:44).

### IV.     Bradstreet's Body Camera Footage

Footage from Bradstreet's body camera begins at approximately 10:18 p.m. when Bradstreet was still in his patrol vehicle. (G. Ex. 7 at 22:18:44). Almost immediately, Bradstreet exits his vehicle and Green is seen approaching the black truck from the vicinity of the store. (*Id.*). Bradstreet approaches the passenger door of the truck, and the footage depicts a patrol car parked in the street parallel to the truck on its right side and another patrol vehicle parked at an angle directly in front of the truck. (*Id.* at 22:18:51– 22:19:00). Bradstreet momentarily pauses at the passenger door and then proceeds around the front of the truck towards the driver's door area where Green, Castrichini, and Contreras are standing. (*Id.* at 22:19:00 – 22:19:06). As Bradstreet approaches them, the audio of the body camera is activated. (*Id.* at 22:19:11).

9

Bradstreet assists in handcuffing and pat-searching Green. (*Id.* at 22:19:15 – 22:20:11). One of the officers asks Green whether he has a permit. (*Id.* at 22:20:10). Green responds, "For what?" (*Id.* at 22:20:12). The officer replies, "For your gun," to which Green responds, "What gun?" (*Id.* at 22:20:13 – 22:20:17). Shortly thereafter, Bradstreet escorts Green to a patrol car, conducts another search of his person, and places him in the rear seat. (*Id.* at 22:20:47 – 22:21:42). The footage stops after Green is inside the vehicle. (*Id.* at 22:21:55).

Approximately twenty minutes later, Bradstreet's body camera is reactivated, and Bradstreet is seated in the driver's seat of his patrol vehicle. (*Id.* at 22:43:29). As the audio commences, Bradstreet can be overheard explaining to Green that he will be taken to the station for booking. (*Id.* at 22:44:08 – 22:44:22). Green asks Bradstreet what will happen to his truck, and Bradstreet informs him that it will be towed. (*Id.* at 22:44:25 – 22:44:27). At that time, Green asks Bradstreet whether someone could come pick up the truck, and Bradstreet responds "No." (*Id.* at 22:44:27 – 22:44:30).

## V.    Shameka M. Carver's Affidavit

In support of his suppression motion, Green submitted an affidavit from Shameka M. Carver ("Carver"). (Docket # 29). In the affidavit, Carver states that she is the registered owner of the black truck and that Green was using the truck with her permission on the evening of February 16, 2019. (*Id.*).

## DISCUSSION

Green seeks suppression of the evidence found in the truck on the grounds that the government has failed to establish that a lawful justification existed for the warrantless search of

the vehicle.  (Docket ## 28 at ¶¶ 22-27; 45).  According to Green, the government's position that the search was permissible pursuant to the automobile exception hinges upon Contreras's testimony that he observed a handgun in plain view when Green opened the truck's door – testimony that Green maintains should not be credited.  (Docket # 45 at 8-10).  In his view, suppression is warranted because Contreras's unreliable testimony constitutes the sole evidence proffered by the government to establish that the gun was observed in plain view.  (*Id.*).  Further, Green maintains that the officers lacked any basis to impound the truck, particularly without first attempting to contact the vehicle's registered owner, or to conduct an inventory search.  (*Id.* at 10-11).

       The government responds that the seizure of the gun was lawful under the plain view exception and that the warrantless search of the vehicle was justified under both the automobile exception and as a valid inventory search prior to impoundment of the vehicle.  (Docket # 46).  The government maintains that the Court should credit Contreras's testimony based upon his demeanor during the hearing and because his testimony was corroborated by the footage obtained from the body cameras worn by the officers.  (*Id.* at 14-15).

       I agree with Green that application of the plain view and automobile exceptions[3] hinges upon the Court's determination whether to credit Contreras's testimony that he observed the handle of a firearm in plain view under the driver's seat when Green opened the door to retrieve his identification.[4]  Accordingly, the first issue I address is Green's contention that

---

[3] The government does not argue that Contreras permissibly searched the vehicle incident to Green's arrest; thus, I do not address that doctrine.  *See generally United States v. Henderson*, 439 F. App'x 56, 58 (2d Cir. 2011) ("[p]olice may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search *or* it is reasonable to believe the vehicle contains evidence of the offense of arrest") (quoting *Arizona v. Gant*, 556 U.S. 332, 346 (2009)).

[4] Green does not challenge as unlawful Contreras's initial conduct in investigating the unattended truck or asking Green for his identification.  (Docket ## 28, 45).

Contreras's testimony contains such substantial inconsistencies and improbabilities as to render it unreliable in its entirety. I disagree.

Green has identified four subjects as to which he contends that Contreras provided dubious, if not demonstrably false, testimony. They are: (1) whether Contreras believed that it would be unsafe to activate his body camera prior to exiting his patrol vehicle, (2) whether attempts to contact the owner of the truck were made before the truck search commenced, (3) whether multiple officers or multiple patrol vehicles routinely assisted in the investigation of traffic infractions, and (4) whether any of the officers had activated their patrol vehicles' emergency lights. (Docket # 45 at 8-9).

With respect to the latter two issues, nothing in the record suggests that Contreras's testimony on these subjects was either false or inconsistent with the evidence. Green has not identified any evidence that undermines Contreras's testimony that it was customary for multiple officers to assist an officer who decides to leave his vehicle to conduct an investigation. As to whether the emergency lights of the patrol vehicles were activated, Contreras did not testify definitively that they were not; rather, he testified that he "believed" that they were not. Review of the body camera footage suggests that the emergency lights of both Contreras's and Castrichini's vehicles had not been activated, although Bradstreet's appear to have been activated. A discrepancy as to such a minor, non-material fact, particularly where it arises from a failure of recollection, does not call into question the credibility of the remainder of Contreras's testimony. *See*, *e.g.*, *United States v. Cancel*, 167 F. Supp. 3d 584, 590 (S.D.N.Y. 2016) (finding that "minor gaps in the record" in the form of "inconsistencies between the officers' testimony and certain documentary evidence" did not "undermine [the court's] conclusion that the officers

12

testified credibly" and that the "material facts" of that testimony demonstrated probable cause supporting defendant's arrest).

Like Green, I am unconvinced by Contreras's testimony that safety concerns caused him to delay activating his body camera before exiting his patrol vehicle. According to Contreras, he felt safer activating the camera when he was on the street and being approached by the owner of the truck than he did when he was exiting his vehicle. Although various reasons could explain why Contreras delayed activating his camera, including that he simply forgot, the one that he offered makes little sense.

Contreras's testimony regarding attempts to contact the vehicle's owner is contradicted by the body camera footage. Contreras testified he was confident that someone had informed him that attempts had been made to contact the owner of the truck prior to his search of the vehicle and that such communication would have been captured by his body camera. As demonstrated by the recordings, Contreras began searching the vehicle less than three minutes after he first spoke with Green. The footage of those three minutes does not depict officers making any efforts to contact the vehicle's owner or communicating with Contreras about any such attempts.

Green urges the Court to reject the entirety of Contreras's testimony as unworthy of belief. In my view, although his testimony concerning the reason he delayed activating his body camera is unpersuasive and his testimony concerning attempted contacts with the vehicle's owner is inaccurate, those issues do not lead me to find the remainder of his testimony unreliable or underserving of credence. Having reviewed the body camera footage and observed and considered Contreras's testimony, including his demeanor and tone during the incident as depicted in the camera footage and during his testimony before the Court, I do not find that

Contreras intentionally misled or deceived the Court about his observation of the firearm. To the contrary, I find that Contreras credibly testified that he observed a portion of the handgun when Green opened the door to the truck.[5]

Indeed, Contreras's testimony regarding his ability to observe the handle of the firearm from his position outside the vehicle is corroborated by other evidence of record. First, Contreras testified that he was trained to specifically observe the "grabbable" areas when conducting traffic stops. Thus, it is reasonable to believe that when Green opened the door Contreras would direct his attention to the area surrounding the driver's seat in order to assess any potential risks to his safety. Further, the body camera footage demonstrates Contreras's flashlight effectively illuminated the interior of the truck even though it was dark at the time of the incident.[6] Review of the footage also demonstrates that Contreras shifted his position as the door to the vehicle was opened so that his view into the vehicle was not completely obscured by Green's body.

Contreras's reaction when Green opened the door is also consistent with his testimony. Within seconds he attempted to detain Green and asked the other officers to assist with handcuffing him. Within moments thereafter, Contreras explained to another officer in a tone of apparent surprise that he had observed the handgun in plain view as the door opened.

---

[5] Nothing in the record supports Green's speculation that Contreras fabricated his report and testimony concerning his attempt to locate relevant footage from a city camera at the intersection. Green has not submitted any authority to support the proposition that the investigating agents were obligated to preserve the footage despite being informed that it did not capture the incident or to take any further investigative steps. In the absence of any cited authority, I deny Green's request for sanctions. (Docket # 45 at 9-10).

[6] Contreras's "action in shining his flashlight to illuminate the interior of the [truck] 'trenched upon no right secured to [Green] by the Fourth Amendment.'" *See United States v. Colter*, 2016 WL 3562053, *2 (E.D.N.Y. 2016) (quoting *Texas v. Brown*, 460 U.S. 730, 739 (1983)); *Mollica v. Volker*, 229 F.3d 366, 369 (2d Cir. 2000) ("a police officer's looking through the windows into the vehicle from outside, even when shining a flashlight to illuminate the inside of the vehicle, does not constitute a 'search' of the vehicle within the meaning of the Fourth Amendment").

14

Moreover, any suggestion by Green that Contreras must have unlawfully opened the driver's door and observed the gun before Green exited the store seems belied by the evidence and common sense. First, Bradstreet's footage began while he was still in his patrol car, at about the same time as Contreras's footage; as soon as Bradstreet exited his car, Green could be seen walking towards the truck. It is reasonable to assume that Bradstreet exited his car upon arrival at the scene, rather than allowing his fellow officer to investigate alone on the street in a high crime area. Further, Bradstreet, who was patrolling with Contreras, arrived and parked momentarily after Contreras did, and very little time likely elapsed before Green came out of the store. No claim is made that Contreras was observed by Green or anyone else opening the door to the truck before interacting with Green. In addition, it simply strains credulity to believe that if Contreras had unlawfully opened the door and seen the gun under the seat he would have allowed Green to subsequently open the door and reach into the driver's seat area.

Because I credit Contreras's testimony that he observed the handle of the gun from his position outside of the vehicle, I find that the gun was properly seized pursuant to the plain view exception to the warrant requirement and that the automobile exception permitted the warrantless search of the truck. The plain view doctrine "authorizes seizure of illegal or evidentiary items visible to a police officer whose access to the object has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with criminal activity." *Illinois v. Andreas,* 463 U.S. 765, 771 (1983). Application of the plain view exception requires that the officer have a legitimate right to be in the location from which the object was plainly viewed, that the item's incriminating character be immediately apparent, and, that the officer have lawful access to the object. *Horton v. California,* 496 U.S. 128, 136-37 (1990).

The automobile exception "permits law enforcement to conduct a warrantless search of a readily mobile vehicle where there is probable cause to believe that the vehicle contains contraband." *United States v. Navas*, 597 F.3d 492, 497 (2d Cir.) (citing *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996)), *cert. denied*, 562 U.S. 954 (2010). If an officer has probable cause to believe that a vehicle contains contraband, the permissible scope of the search extends anywhere within the vehicle that the contraband may be located, including containers or packages. *Id.*

In this case, Contreras observed the handle of a gun when Green opened the door to the vehicle. Upon observing the gun in plain view, its incriminating nature was immediately apparent, justifying its seizure. *See United States v. Sanchez-Villar*, 99 F. App'x 256, 258 (2d Cir. 2004) ("[u]nder New York law, it is a crime to possess a firearm[; . . ] because it is beyond dispute that the officers were lawfully located in a place from which they plainly could see the gun, the officers were justified in seizing it because of its 'immediately apparent' incriminating character") (citing N.Y. Penal Law § 265.01(1)), *judgment vacated and remanded pursuant to United States v. Booker*, 544 U.S. 1029 (2005); *United States v. Scopo*, 19 F.3d 777, 782 (2d Cir.) ("the mere presence of a partially concealed firearm is highly and immediately incriminating[;] [t]hus, . . . the police were justified in both stopping and arresting [defendant], and in seizing his firearm"), *cert. denied*, 513 U.S. 877 (1994); *United States v. Levy*, 217 F. Supp. 3d 643, 668 (E.D.N.Y. 2016) ("defendant's gun was visible to anyone standing at the open door of the car, and the incriminating nature of the gun was immediately apparent to anyone observing it[;] . . . [t]he officers had a lawful right to seize it"); *United States v. Colter*, 2016 WL 3562053 at *2 ("[t]he gun, discovered inadvertently, the incriminating nature of which was immediately apparent, was lawfully seized in accordance with the plain view exception to

16

the Fourth Amendment"). Further, upon discovery of the gun, the officers had probable cause to believe that Green unlawfully possessed a firearm in violation of New York Penal Law Section 265.01 and that evidence of that crime might be found within the vehicle, permitting its search. *See United States v. Miller*, 265 F. App'x 5, 8 (2d Cir.) ("once [the officer] discovered [a loaded magazine] within the glove compartment of [defendant's] car as a consequence of their authority to search incident to arrest, they had sufficient probable cause under the automobile exception to justify their search of [defendant's] trunk"), *cert. denied*, 555 U.S. 993 (2008); *United States v. Edwards*, 2012 WL 3240613, *6 (S.D.N.Y. 2012) ("[u]pon seeing the hammer of the gun, the officers could lawfully conduct a warrantless search of the [vehicle], pursuant to the automobile exception"); *United States v. Fuller*, 2007 WL 3006081, *2 (E.D.N.Y. 2007) ("upon shining the flashlight into the car, [the officer] observed a firearm . . . [;] [a]t this point, [the officer] was entitled to seize the gun that was in plain view[,] . . . [and] the gun in plain view gave the officers probable cause to believe the car contained contraband, thus allowing them to search the car pursuant to the automobile exception to the search warrant requirement"); *United States v. Felipe*, 1996 WL 573606, *1 (S.D.N.Y. 1996) ("[t]he search of the vehicle and its occupants was permissible once [the officer] had seen what appeared to be a gun in the vehicle"); *see also United States v. Venner*, 2016 WL 8730170, *10 (D.V.I. 2016) (observation of firearm magazine provided officer with probable cause to believe vehicle contained "contraband, specifically an unlawfully possessed gun and ammunition[;] [a]ccordingly, the subsequent search of the [vehicle] was permissible under the automobile exception, and the evidence received – *i.e.* the magazine, firearm, ammunition, marijuana and drug paraphernalia – was lawfully discovered").

For the reasons discussed above, I recommend that the district court deny Green's motion to suppress the tangible evidence found in the truck.[7]

## CONCLUSION

Accordingly, I deny Green's request for sanctions.  Further, I recommend that the district court deny Green's motion to suppress evidence.  **(Docket # 28)**.

*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
July 17, 2020

---

[7] Having concluded that the warrantless search of the vehicle was permissible pursuant to the automobile exception, I need not address the government's alternative argument that the search was a permissible inventory search (Docket # 46 at 11-15).  *See generally United States v. Lyle*, 919 F.3d 716, 731 (2d Cir. 2019) ("whether a decision to impound is reasonable under the Fourth Amendment is based on all the facts and circumstances of a given case"), *cert. denied*, 140 S. Ct. 846 (2020).

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.[8]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See*, *e.g.*, *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(b) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

       *s/Marian W. Payson*
       MARIAN W. PAYSON
       United States Magistrate Judge

Dated: Rochester, New York
       July 17, 2020

---

[8] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).